**AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR A**
**CRIMINAL COMPLAINT AND SEARCH WARRANT**

I, Joseph P. Flynn, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Trooper with the Massachusetts State Police ("MSP") and a Task Force Officer ("TFO") currently assigned to the Federal Bureau of Investigation ("FBI") and the New England Organized Crime Drug Enforcement Task Force ("OCDETF").

2.      I have been employed by MSP since August of 2017.  Upon completion of the Massachusetts State Police Academy in January of 2018, I was assigned to the Division of Field Services conducting uniformed patrol duties until October of 2020.  In October of 2020, I was assigned to the Division of Homeland Security and Preparedness in the Narcotics Section as a TFO for the United States Postal Inspection Service on the Contraband Interdiction and Investigations (CI2) Team.  I served in this capacity until June of 2022 when I was reassigned as a TFO with the FBI.  I am an investigative or law enforcement officer of the United States and authorized to exercise the powers of enforcement personnel set forth in 21 U.S.C § 878.  I am deputized pursuant to Title 28, Federal Code of Regulations, sections 0.112 and 0.19A, and I am charged with the duty of investigating violations of the laws of the United States as stated in Title 28, Federal Code of Regulations by order of the Attorney General of the United States.

3.      I have received training from the New England State Police Information Network, the MSP, the United States Postal Inspection Service, and the Massachusetts National Guard Counter Drug Program in (among other things) basic narcotic investigations, drug identification, drug detection, interdiction, familiarization with narcotic laws, identification and seizure of drug related assets, organized crime investigations, and physical and electronic surveillance techniques.

4.      My primary duties as an FBI TFO include the investigation of organized narcotic traffickers, narcotic distribution and money laundering offenses, and other federal and state crimes. I have participated in numerous arrests for both state and federal law violations, seizures of large quantities of controlled substances, physical and electronic surveillance, the execution of search warrants, and debriefing of informants.  In conjunction with other federal law-enforcement agencies I have participated in investigations of large scale national and international drug trafficking organizations.

5.      Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds.  I am also familiar with the way narcotics traffickers use personal and rented cars and trucks, common carriers, mail and private delivery services, and a variety of other motor vehicles to: (a) meet with co-conspirators, customers, and suppliers; (b)transport, distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d) transport the proceeds of narcotics transactions.

6.      Based on my training and experience, narcotics trafficking typically involves the local, interstate, and international movement of illegal drugs, to distributors and co-conspirators at multiple levels, and the movement of the proceeds of narcotics trafficking among multiple participants including suppliers, customers, distributors, and money launderers.  Within the United States and the District of Massachusetts, illegal drugs and drug money are most often transported in motor vehicles.  Consequently, the location of vehicles used by narcotics traffickers and those working with them can be instrumental in identifying and intercepting shipments of illegal drugs and drug proceeds.

7.    More broadly, based upon my training and experience, tracking drug traffickers in motor vehicles frequently leads to evidence of narcotics and money laundering offenses, including, but not limited to: (a) the identification of potential criminal associates, such as criminal co-conspirators, suppliers of illegal narcotics, and money launderers; (b) the identification of physical locations at which illegal drugs are offloaded, stored, and/or distributed, including residences, businesses, commercial storage facilities, warehouses, and ports; and/or (c) the identification of locations where drug proceeds are stored, deposited, concealed, used in monetary and financial transactions and laundered, including private businesses, banks, wire-remitter businesses, and other financial institutions.

8.    Based on my training and experience, tracking narcotics traffickers in motor vehicles often corroborates and verifies other information and investigative leads derived from other investigative techniques including informants, wiretaps, and visual surveillance.

### Purpose of the Affidavit

6.    I submit this affidavit in support of an application for a criminal complaint charging Noel BETANCES ("NOEL") and Reylin SEGURA with Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances, in violation of Title 21, United States Code, Section 846 (the "Charged Offense").

7.    I also make this affidavit in support of an application for a warrant authorizing the search of 16 Rand Street, Revere, Massachusetts 02151 (including outbuildings) the residence of NOEL's brother, Joel BETANCES ("JOEL") (the "Target Premises"), further described in Attachment A, for evidence of the Charged Offense, described more fully in Attachment B.

8.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended

to show that there is probable cause to believe that the Target Subjects committed the Charged Offense.  Additionally, there is probable cause to believe that evidence of the Charged Offense, described more fully in Attachment B, exists in the Target Premises, described more fully in Attachment A.  This affidavit is intended to show that there is probable cause for the requested criminal complaint and search warrant and does not set forth all of my knowledge about this matter.

## Probable Cause

9.   In or about June 2023, investigators from the U.S. Postal Inspection Service ("USPIS") and the Boston OCDETF Strike Force began investigating a drug-trafficking organization that used the U.S. Postal Service to import kilograms of cocaine from Puerto Rico to the greater Boston area.

10.   USPIS previously conducted an analysis of parcels shipped through the mail that were found to contain drugs and drug proceeds. The analysis found that the parcels were usually sent from an individual to an individual. Additionally, this analysis established a series of parcel characteristics. These characteristics include the following: (1) parcel was mailed from or addressed to a narcotic source city; (2) parcel has a fictitious return/sender address or name; (3) parcel has address information which is handwritten; (4) the handwritten mailing label on the parcel does not contain a business account number, thereby indicating that the sender paid cash; (5) parcel is addressed from an individual to an individual; and (6) parcel is heavily taped. When a parcel meets two or more of these criteria, the analysis showed there is a high probability that the parcel will contain a controlled substance or the proceeds of controlled substance sales.

11.   In June 2023, investigators used the above factors to identify a suspicious parcel sent from Puerto Rico and bound for 132 Webster Ave., Chelsea, Massachusetts.  The parcel was seized at a USPS facility in Puerto Rico and searched pursuant to a warrant issued by the Hon.

Marcos E. Lopez, U.S. Magistrate Judge, District of Puerto Rico. Inside the parcel was a wooden drawer/shelf that, in turn, contained approximately 5 kilograms of a substance that field-tested positive as cocaine.

12. Following the June 2023 seizure, investigators determined that a Comcast account subscribed to Edgar Joel Baez at the Target Premises (16 Rand Street, Revere, Massachusetts) had tracked the status of the seized package. That same account tracked packages with similar characteristics addressed to JOEL (Joel Betances) and to Zobeida DAVILA at the Target Premises. In addition, a T-Mobile account subscribed to DAVILA tracked the status of the package seized in Puerto Rico. DAVILA is believed to be the wife or significant other of JOEL based on surveillance observations of them together.

13. Investigators subsequently performed surveillance of additional suspicious packages (based on the USPIS factors) that were sent from Puerto Rico to Massachusetts addresses. Investigators saw NOEL, believed to be the brother of JOEL, pick up suspicious packages on dates including July 14, 2023 (Chelsea); July 21, 2023 (Chelsea); July 31, 2023 (Chelsea); and August 14, 2023 (Boston). Following the pickup on August 14, 2023, investigators saw NOEL carry the package into the Target Premises. Investigators later that day saw NOEL drive to Chelsea, where he opened his trunk in the area of a dumpster. Inside the dumpster, investigators later found the suspicious package, which had a wooden drawer/shelf similar to the

drawer/shelf found inside the cocaine package searched in Puerto Rico and found to contain cocaine.

*August 2025: Investigators Received Communications About Possible Drug Exchanges Involving NOEL or JOEL in Front of 125 Dale Street, Revere*

14. In August 2025, DEA investigators in Plattsburgh, New York, seized approximately 25 kilograms of cocaine in New York from a blue Mitsubishi that had recently traveled to Massachusetts. Plattsburgh investigators provided Massachusetts DEA investigators with communications from a phone seized from one of the occupants of the blue Mitsubishi. The phone described a meeting on July 26, 2025, at "125 Dale Street" in Revere between the occupants of the blue Mitsubishi and the occupants of a "white Acura." Investigators confirmed from surveillance cameras in the area that such a meeting occurred. Investigators further confirmed from license-plate reader information that a white Acura registered to DAVILA (JOEL's wife) was in that approximate area at that approximate time.

*August 12, 2025: NOEL Retrieved 4 Kilograms of Cocaine from the Target Premises and Delivered It to SEGURA*

15. On August 12, 2025, at approximately 7:18 p.m., investigators saw NOEL leaving the D'Joel Barbershop in Chelsea, Massachusetts. NOEL got into a white Toyota Highlander registered to a woman with his same last name (the "white Highlander"). NOEL drove at a high rate of speed to the Target Premises.

16. At approximately 7:24 p.m., NOEL approached the front door of the Target Premises and used a key to open the door. Minutes later, NOEL exited the Target Premises

carrying an item under his arm consistent with the size and shape of a box.  NOEL put the item in the white Highlander and drove away.  Investigators followed.

17.  At approximately 7:28 p.m., NOEL arrived in the area of 125 Dale Street, Revere. At approximately 7:32 p.m., a dark-colored Volkswagen SUV rental pulled up alongside the white Highlander, driver's window to driver's window.  The Volkswagen then backed up and parked in front of the white Highlander.  Investigators saw NOEL exit the white Highlander carrying a brown cardboard box.  NOEL approached the front passenger door of the Volkswagen and leaned inside. NOEL then pulled away from the Volkswagen without the cardboard box.  NOEL was now carrying a white shopping bag and returned to the white Highlander.

18.  Investigators approached both cars and identified themselves as law enforcement. Reylin SEGURA was identified, by driver's license, as the sole occupant of the Volkswagen.  A cardboard box consistent with the one NOEL had just put inside the Volkswagen was on the front passenger seat of the Volkswagen.  The box was closed.  Investigators opened the box.  Inside it were four brick-shaped items consistent, in my training and experience, and being 4 kilograms of narcotics.  Inside the bricks was powder.  Investigators field tested the powder and the result was positive for cocaine.  On the center console of SEGURA's Volkswagen was a clear plastic baggie with white powder inside.  Investigators field tested the powder and the result was positive for cocaine.

19.  Investigators located the white shopping bag NOEL retrieved from the Volkswagen.  Inside the white shopping bag was large amounts of bundled cash.  Investigators

have not performed an official count of the cash, but based on my training and experience it appears to be in the tens of thousands of dollars.

20.   The Target Premises is owned by an LLC.  On the evening of August 12, 2025, investigators observed vehicles registered to DAVILA, using a registered address of the Target Premises, in the driveway of the Target Premises.  One of the vehicles was registered to both DAVILA and JOEL.  DAVILA's driver's license also currently uses the Target Premises as an address. Based on that information; the fact that packages were sent to JOEL and DAVILA at the Target Premises in 2023 and a Comcast account there tracked suspicious packages; and the fact that NOEL opened the Target Premises with a key on August 12, 2025, I believe the Target Premises is the residence of JOEL and DAVILA and that NOEL has access.  Based on the historic and recent drug-trafficking activity at the Target Premises, including the fact that today, NOEL removed a package containing four kilograms of suspected cocaine from the Target Premises, investigators believe that evidence of the Charged Offense will be located inside the Target Premises.

21.   A small outbuilding (shed) behind the Target Premises, at the end of the Target Premises' driveway, is part of the Target Premises.  In my training and experience, drug traffickers may use such outbuildings to store narcotics.

22.   Investigators seek to search the Target Premises after 10:00 p.m. because this warrant is being signed after 10:00 p.m.

### Drug Traffickers' Use of Residences and Cell Phones Generally

23.   Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug

traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences:

a.  Controlled substances.

b.  Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

c.  Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions, ledgers, text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds, bank records, money orders, wire transfers, cashier's checks, checkbooks, passbooks, certificates of deposit, vehicle rental receipts, credit card receipts, and receipts reflecting rental properties and/or storage units.

d.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books, planners, notes, ledgers, and telephone bills.

e.  Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to,

jewelry, precious metals such as gold and silver, precious gems such as diamonds, titles, deeds, monetary notes, registrations, purchase or sales invoices, and bank records.

f.    Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g.    Labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

h.    Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

i.    Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

22.    Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents. Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences, quantities of illicit drugs to maintain their ongoing drug business.  I

also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences for longer periods of time than they keep drugs in their residences.

23.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

24.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice

11

for traffickers to conceal, at their residences, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

25.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

26.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes, hidden compartments, or other containers so that other individuals who enter their residence do not discover these materials.

27.     Many drug dealers receive their drugs through overnight parcels and keep mailing labels both used and unused in their residence for future use.  Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs.  Such individuals will often

maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

28.     During the course of searches of residences, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the residences.  Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills.  These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

29.     Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators.  As described above, the Target Subjects used cellular telephones to communicate with undercover agents and cooperating witnesses to arrange drug purchases.  In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones

13

(where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

30.    Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the

location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

31.    Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.  Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

32.    Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a

15

GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals.  Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

33.    Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

a.  Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.  Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and

16

who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

**Conclusion**

34. Based on the foregoing, there is probable cause to believe that the Target Subjects committed the Charged Offense and that evidence of the commission of the Charged Offense,

more specifically, the items set forth in Attachment B, will be found in the Target Premises, described in Attachment A.

Respectfully submitted,

Joseph P. Flynn (by JDH)

Joseph P. Flynn, Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to telephonically in accordance with Federal Rule of Criminal Procedure 4.1 on August 12, 2025.

Hon. Jessica D. Hedges
United States Magistrate Judge

18

**<u>Attachment A – Premises to be Searched</u>**

The premises to be searched is 16 Rand Street, Revere, Massachusetts 02151, including outbuildings (the "Target Premises"). The Target Premises is described as a white, two-story single-family home with dark trim. The number "16" is affixed next to the front door, along with the words "Welcome." A shed is behind the building and forms part of the Target Premises. Photographs of the Target Premises appears below.





## **Attachment B—Items to be Seized**

All records, in whatever form, from June 2023 to present, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of Conspiracy to Distribute and Possess with Intent to Controlled Substances, in violation of Title 21, United States Code, Section 846 (hereinafter, the "Charged Offense").

1. Illegal controlled substances, including but not limited to cocaine.

2. Paraphernalia for packaging and distributing controlled substances, including but not limited to, plastic bags and scales.

3. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

4. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, photographs, telephone address books; planners; notes; and ledgers.

5. Cash, currency, and records relating to drug trafficking activity income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; monetary notes; registrations; purchase or sales invoices; and bank records.

6. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

7. Items of personal property that tend to identify the person(s) in control, or ownership of the target vehicle. Such identification evidence is typical of the articles people commonly maintain in their vehicles, such as mail, registration documents, vehicle maintenance receipts, bank receipts, credit card receipts, identification documents, and keys.

8. Cellular telephones in the possession of or used by Joel BETANCES, Noel BETANCES, Zobeida DAVILA, Reylin SEGURA, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

   a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

   b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c. Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

   d. Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   e. GPS data;

   f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   g. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   h. All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

   i. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

22